**In the Matter of IKO ROOFING SHINGLE PRODUCTS LIABILITY LITIGATION**

**Appeal of Debra Zanetti, et al., on behalf of a proposed class.**

No. 14–1532.

United States Court of Appeals, Seventh Circuit.

Argued June 5, 2014.

Decided July 2, 2014.

Christopher M. Ellis, Attorney, Jon D. Robinson, Attorney, Bolen Robinson & Ellis, Decatur, IL, Samuel Issacharoff, Attorney, New York University Law School, New York, NY, for Debra Zanetti.

Before WOOD, Chief Judge, and EASTERBROOK and KANNE, Circuit Judges.

EASTERBROOK, Circuit Judge.

Purchasers of organic asphalt roofing shingles in many states have filed suits against IKO Manufacturing and affiliated firms, contending that it falsely told customers that these shingles met an industry standard known as ASTM D225, and that

compliance had been ascertained by use of a testing protocol known as ASTM D228. What distinguishes an "organic" asphalt tile is the inclusion of a layer made from felt or paper; tiles that include a fiberglass layer are not called organic, even though asphalt itself has organic components. We omit other details about the tiles and the standards, for the merits of plaintiffs' claims are not material to the current dispute.

In 2009 the Panel on Multidistrict Litigation transferred all of the federal suits to the Central District of Illinois for consolidated pretrial proceedings under 28 U.S.C. § 1407. Plaintiffs asked the court to certify a class that would cover IKO's sales in eight states since 1979. The court declined, 2014 U.S. Dist. Lexis 80243 (C.D.Ill. Jan. 28, 2014), and we granted the plaintiffs' request for interlocutory review under Fed.R.Civ.P. 23(f).

Before addressing plaintiffs' arguments about the class-certification decision, we must consider whether the judge who denied plaintiffs' motion had authority to preside over the litigation. Section 1407(b) provides that the "pretrial proceedings shall be conducted by a judge or judges to whom such actions are assigned by the judicial panel on multidistrict litigation." The Panel assigned the cases to Judge McCuskey, who had agreed to accept them. In his capacity as the district's Chief Judge at the time, he reassigned them to Judge Baker early in 2010. Unfortunately, Judges McCuskey and Baker failed to recognize that § 1407(b) gives the Panel exclusive power to select the judge. Its rules provide that, "[i]f for any reason the transferee judge is unable to continue those responsibilities, the Panel shall make the re-assignment of a new transferee judge." Rules of Procedure of the United States Panel on Multidistrict Litigation 2.1(e). Neither judge asked the Panel to change the assignment. The Panel proceeded to transfer follow-on cases to Judge McCuskey through 2012, without appreciating that all he did was relay them to Judge Baker. Eventually the Panel got wind of the situation (the record does not reveal how) and on February 12, 2014, issued an order transferring all of the cases to Judge Baker. But he had denied plaintiffs' motion for class certification two weeks earlier. In legal jargon, he was acting *ultra vires*.

■ If the problem deprived the court of subject-matter jurisdiction, then there is nothing for us to do but vacate the order of January 28—and every other order Judge Baker entered during the preceding four years. We do not think, however, that § 1407 affects subject-matter jurisdiction, a term that deals with the *tribunal's* adjudicatory competence. See, e.g., *Gonzalez v. Thaler*, —— U.S. ——, 132 S.Ct. 641, 181 L.Ed.2d 619 (2012); *Henderson v. Shinseki*, —— U.S. ——, 131 S.Ct. 1197, 179 L.Ed.2d 159 (2011); *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 130 S.Ct. 1237, 176 L.Ed.2d 18 (2010); *Minn–Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845 (7th Cir.2012) (en banc).

All of these suits are properly in federal court, and for that matter properly in the Central District of Illinois for consolidated pretrial proceedings. A district court's error in complying with § 1407(b), which gives the Panel exclusive authority to select the transferee judge, does not vitiate the Panel's selection of the appropriate district court, the subject of a separate clause in § 1407(a). In the Supreme Court's current terminology, § 1407(b) creates a case-processing rule rather than a jurisdictional one. One vital difference between the two is that the litigants may waive or forfeit the benefits of case-processing rules, while jurisdictional rules must be enforced by the judiciary on its own initiative, even if the litigants are

content. No one protested Judge Baker's role, so whatever benefit the original selection of Judge McCuskey may have offered to any litigant has been forfeited.

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach,* 523 U.S. 26, 118 S.Ct. 956, 140 L.Ed.2d 62 (1998), which thoroughly analyzes § 1407, supports this understanding. The Court held in *Lexecon* that transferee courts' authority depends on § 1407, and that they cannot exercise greater power than the statute provides. This means that transferee judges and the Panel must implement the final sentence of § 1407(a), which reads: "Each action so transferred shall be remanded by the panel at or before the conclusion of such pretrial proceedings to the district from which it was transferred unless it shall have been previously terminated". That sentence prevents transferee courts from seizing control for all purposes, including trial, of litigation that is supposed to be in their charge only for pretrial coordination. The Court analogized this provision to the venue rules in 28 U.S.C. § 1391 and observed that it, like other venue rules, gives plaintiffs a right to proceed in their chosen forum. 523 U.S. at 41–42, 118 S.Ct. 956. But venue differs from subject-matter jurisdiction, which is why *Lexecon* was careful to observe, *id.* at 43, 118 S.Ct. 956, that its holding applies to a "party who continuously objected to an uncorrected categorical violation of the mandate [in § 1407(a)]". The need for objection puts the requirements of § 1407 on the "case-processing" rather than the "jurisdictional" side of the Supreme Court's line.

Statutes in addition to § 1407 allow federal judges to be designated to hear cases that otherwise would be in the bailiwick of a different judge, and this is not the first time there has been a foul-up in the process. Both *McDowell v. United States,* 159 U.S. 596, 601–02, 16 S.Ct. 111, 40 L.Ed. 271 (1895), and *Ball v. United States,* 140 U.S. 118, 128–29, 11 S.Ct. 761, 35 L.Ed. 377 (1891), hold that errors in designation do not spoil the action of the judge who actually renders decision. *Nguyen v. United States,* 539 U.S. 69, 77–83, 123 S.Ct. 2130, 156 L.Ed.2d 64 (2003), declines to extend the principle of these opinions to judges who are *ineligible* to be designated. The chief judge of a court of appeals had designated a judge from the Northern Mariana Islands to sit on an appellate panel. Because judges of that territory serve under Article IV rather than Article III, the designated judge was ineligible under both the statute and the Constitution. *Nguyen* holds that the participation of an ineligible decisionmaker requires vacatur of the judgment, even though two Article III judges, a quorum of the panel, had joined it, and no one objected to the panel's composition until after it had released its decision.

The transfer of these proceedings to Judge Baker is on the technical side of *Nguyen*'s line. No one thinks him ineligible to be a transferee judge. The Panel now has designated him to serve in that capacity. Given the technical nature of this problem and the lack of objection by any litigant, we need not decide whether the Panel's order would have had retroactive effect and thus overridden a litigant's objection to Judge Baker's role.

On to the class-certification issue. One vital question under Fed.R.Civ.P. 23(b)(3) is whether "the questions of law or fact common to class members predominate over any questions affecting only individual members". IKO's tiles are exposed to the elements, where they may fail no matter how well constructed. Tornados and hurricanes may rip them off; storms may lift them up so that water gets under them. Poor installation may shorten their expected life. At the same time, some tiles that flunk the D225 standard will last

indefinitely. The district court thought that the inevitable differences in consumers' experiences with IKO's tiles prevent class certification under the language we have quoted.

The court read *Comcast Corp. v. Behrend*, —— U.S. ——, 133 S.Ct. 1426, 185 L.Ed.2d 515 (2013), and *Wal–Mart Stores, Inc. v. Dukes*, —— U.S. ——, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011), to require proof "that the plaintiffs will experience a common damage and that their claimed damages are not disparate." 2014 U.S. Dist. LEXIS 80243 at *9. Elsewhere the district court wrote that "commonality of damages" is essential. *Id.* at *13, 20, 23. If this is right, then class actions about consumer products are impossible, and our post-*Comcast* decision in *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796 (7th Cir. 2013), must be wrong. *Pella Corp. v. Saltzman*, 606 F.3d 391 (7th Cir.2010), which approved class treatment of litigation asserting defects in casement windows, another product used in home construction or renovation, also would be wrongly decided under the district court's reading of *Comcast* and *Wal–Mart*. Indeed, we could not affirm the district court's decision in this case without overruling *Pella*, so close are the circumstances of the two home-product-defect suits.

Yet *Wal–Mart* has nothing to do with commonality of damages. It dealt instead with the need for *conduct* common to members of the class, and it concerned Rule 23(a)(2) rather than Rule 23(b)(3). Plaintiffs in *Wal–Mart* contended that discretionary acts by managers of more than 2,000 local stores produced discriminatory effects. When writing that commonality under Rule 23(a)(2) requires proof of the same injury, the Court observed that each store was managed independently; it held that when multiple managers exercise discretion, conditions at different stores do

not present a common question. See also *Bolden v. Walsh Construction Co.*, 688 F.3d 893 (7th Cir.2012). In that situation damages differ, to be sure, but only because the underlying conduct differs. In a suit alleging a defect common to all instances of a consumer product, however, the conduct does not differ.

*Comcast*, by contrast, does discuss the role of injury under Rule 23(b)(3), though not in the way the district court thought. Plaintiffs filed an antitrust suit and specified four theories of liability. The district judge certified a class limited to one of these four. The plaintiffs' damages expert, however, estimated harm starting with the assumption that all four theories had been established. The Court held that this made class treatment inappropriate: without a theory of loss that matched the theory of liability, the class could not get anywhere.

That would be equally true in a suit with just one plaintiff. In antitrust law, damages are limited to the sort of injury that flows from unlawful conduct. See, e.g., *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). Competition creates benefits for consumers and harm for producers at the same time, while monopoly causes harm to consumers and some producers. It is essential to distinguish the encouraged injuries (to producers, from competition) from the forbidden ones (to consumers, from monopoly). That requires matching the theory of liability to the theory of damages. *Comcast* explained: "The first step in a damages study is the translation of the *legal theory of the harmful event* into an analysis of the economic impact *of that event*." 133 S.Ct. at 1435, quoting from Federal Judicial Center, *Reference Manual on Scientific Evidence* 432 (3d ed.2011) (emphasis added by *Comcast*).

Plaintiffs in our litigation have two theories of damages that match their theory of liability. The first is that every purchaser of a tile is injured (and in the same amount per tile) by delivery of a tile that does not meet the quality standard represented by the manufacturer. Damages reflect the difference in market price between a tile as represented and a tile that does not satisfy the D225 standard. See Uniform Commercial Code § 2–714(2). This remedy could be applied to every member of the class.

The second theory is that purchasers whose tiles actually failed are entitled to recover damages, if nonconformity to the D225 standard caused the failure. That sort of remedy would require buyer-specific hearings along the lines discussed in *Butler*, 727 F.3d at 798. The problems encountered in an effort to settle *Pella* (see *Eubank v. Pella Corp.*, No. 13–2091, 753 F.3d 718, 2014 WL 2444388 (7th Cir. June 2, 2014)) imply the wisdom of using the first approach to damages. (The first and second are alternatives: they imply the same gross compensation to the class as a whole, and to award both remedies would be double counting.) But neither approach runs afoul of *Comcast*: both the uniform and the buyer-specific remedies match the theory of liability, as *Comcast* requires.

A buyer-specific remedial approach would require confining any class certification to questions of liability, as in *Pella I* and *Butler*. It is not hard to frame liability issues suited to class-wide resolution. (1) Did IKO's tiles generally conform to the substantive aspects of the D225 specification? ("Generally" is an important qualifier. In any mass production operation, defects or deviations are inevitable.) (2) Did IKO test the tiles according to the D228 procedure? (3) If IKO failed to use the D228 procedure, did it nonetheless test its output in a way that would verify compliance? (If yes, this implies that a negative answer to Question 2 would not play a causal role in buyers' losses.) (4) Did any failure to satisfy the D225 standard cause the sorts of problems plaintiffs reported, or would roughly the same failure rate have been experienced with complying tiles? (The answer could be "no causation" because the difference between D225–compliant tiles and other organic tiles is sufficiently small that it would not lead to a materially different failure rate.)

We do not say that a district court is *required* to certify a class action on all four of these subjects, or on a class-wide damages theory, or indeed on any issue. A district judge has discretion to evaluate practical considerations that may make class treatment unwieldy despite the apparently common issues. On occasion the problems are so grave that it is an abuse of discretion to certify a class. See, e.g., *Parko v. Shell Oil Co.*, 739 F.3d 1083 (7th Cir.2014). But when exercising its discretion the court must apply the correct legal standards. The district court denied plaintiffs' motion to certify under a mistaken belief that "commonality of damages" is legally indispensible. With that error corrected, the district court can proceed using the proper standards.

The papers filed in this court address a number of additional issues that are outside the scope of a Rule 23(f) appeal. Whether particular experts' reports satisfy the criteria of Fed.R.Evid. 702, for example, is a subject addressed to the district court in the first instance (the judge has not ruled yet) and reviewable on appeal from a final decision. Likewise we do not express any view on the question whether the evidence compiled so far supports the plaintiffs' contention that the tiles are defective. That some or even many tiles examined 15 years after their manufacture flunk the D225 standard does not neces-

sarily imply that they did so when they left the factory; it is essential to understand how organic tiles change over time and extrapolate from current data to the tiles' likely condition when sold. That the average age of tiles that have already failed is 12 years does not establish that all tiles had an expected 12–year life when made; IKO represents that less than 1% of its tiles have failed (or, perhaps more accurately, that less than 1% are reported as having failed). It may require sophisticated analysis to determine what failure data imply about the durability of tiles as manufactured. The simplistic pro-and-con presentations in the papers filed here do not make much progress in establishing the tiles' mean time between failures or their half-life in use.

Getting these numbers right will be a central task for the district court whether or not a class is certified on remand. Development of facts also may influence the ultimate decision about class certification—and, to repeat, we do not say that certification is required (or necessarily would be prudent), or what if any issues should be certified. Those matters are for the district court.

The decision declining to certify a class is vacated, and the case is remanded for proceedings consistent with this opinion.